IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
LOUIS VUITTON MALLETIER S.A.    )
                                )
          Plaintiff,            )
                                )       1:06cv321(JCC)
          v.                    )
                                )
HAUTE DIGGITY DOG, LLC,         )
VICTORIA D.N. DAUERNHEIM, and   )
WOOFIES, LLC                    )
                                )
          Defendants.           )
```

**M E M O R A N D U M   O P I N I O N**

This matter comes before the Court on Plaintiff's and
Defendants' cross-motions for summary judgment.  This "dog of a
case" gave the Court a great amount of facts to chew upon and
applicable law to sniff out.  Nonetheless, having thoroughly
gnawed through the record, this Court finds that no material
dispute of fact remains, and summary judgment is appropriate on
all counts.  For the following reasons, the Court will deny
Plaintiff's motion and grant Defendants' motion.

**I.  Background**

Plaintiff, Louis Vuitton Malletier S.A., ("LVM") is a
manufacturer of luxury consumer goods, including luggage and
handbags.  In 1896, LVM created a Monogram Canvas Pattern Design
mark and trade dress, which includes, *inter alia,* an entwined L
and V monogram with three motifs and a four pointed star, and is
used to identify its products.  In 2002, Vuitton introduced a new
signature design in collaboration with Japanese designer Takashi

Murakami.  LVM manufactures a limited number of high-end pet products, such as leashes and collars that range in price from $250 to $1600.

Plaintiff filed this action on March 24, 2006 against Defendants Haute Diggity Dog, LLC ("HDD"), Victoria Dauernheim, and Woofies, LLC d/b/a Woofie's Pet Boutique.  HDD is a company that markets plush stuffed toys and beds for dogs under names that parody the products of other companies.  HDD sells products such as Chewnel #5, Dog Perignon, Chewy Vuiton, and Sniffany & Co. in pet stores, alongside other dog toys, bones, beds, and food, and most are priced around $10.  Plaintiff's complaint specifically refers to HDD's use of the mark "Chewy Vuiton" and alleges that this mark, as well as other marks and designs that imitate Plaintiff's trademarks and copyrights, violate Plaintiff's trademark, trade dress, and copyright rights. Plaintiff and Defendants have filed cross-motions for summary judgment.  These motions are currently before the Court.

## II.  Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Applications & Serv., Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996)(citations

2

omitted).  In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant."  *Brock v. Entre Computer Ctrs.*, 933 F.2d 1253, 1259 (4th Cir. 1991)(citations omitted).

The very existence of a scintilla of evidence or of unsubstantiated conclusory allegations, however, is insufficient to avoid summary judgment.  *Anderson*, 477 U.S. at 248-52. Rather, the Court must determine whether the record as a whole could lead a reasonable trier of fact to find for the non-movant. *Id.* at 248.

### III.  Analysis

### Count I: Trademark Infringement

Plaintiff and Defendants have filed cross-motions for summary judgment on the issue of trademark infringement.  To prevail on a claim for trademark infringement, Plaintiff must show that it possesses a protectable mark, which Defendants used in commerce in connection with sale, offering for sale, distribution, or advertising in a manner likely to confuse customers.  *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001).  The unauthorized use of a trademark infringes the trademark holder's rights if it is likely to confuse an "ordinary consumer" as to the source or sponsorship

3

of the goods. *Anheuser-Busch, Inc. v. L&L Wings, Inc.,* 962 F.2d 316, 318 (4th Cir. 1992).

Factors considered when determining the likelihood of confusion are: (1) strength and distinctiveness of the plaintiff's mark; (2) degree of similarity between the two marks; (3) similarity of the products that the marks identify; (4) similarity of the facilities the two parties use in their business; (5) similarity of the advertising used by the two parties; (6) defendant's intent; and (7) actual confusion. *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir. 1984). No single factor is dispositive, and these factors are not of equal importance or relevance in every case. *Petro Shopping Centers v. James River Petroleum, Inc.,* 130 F.3d 88, 91 (4th Cir. 1997). This Court must carefully consider each of these factors and determine by a totality of the circumstances if likelihood of confusion exists, and then determine if summary judgment is appropriate for Plaintiff or Defendants.

A. Strength of Plaintiff's Mark

Strength of mark is usually a strong factor in determining customer confusion. However, in cases of parody, the opposite can be true. *See, e.g., Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,* 221 F.Supp.2d 410, 416 (S.D.N.Y. 2002). A "parody" is defined as a "simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark

4

with the idealized image created by the mark's owner." *People for Ethical Treatment of Animals*, 263 F.3d at 366 (citing *LL Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 34 (1st Cir. 1987). A parody must "convey two simultaneous-and contradictory-messages: that it is the original, but also that it is *not* the original and is instead a parody." *Id.* In cases of parody, a strong mark's fame and popularity is precisely the mechanism by which likelihood of confusion is avoided. *See Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 503-04 (2d Cir. 1996); *Schieffelin & Co. v. Jack Co. Of Boca, Inc.,* 850 F.Supp. 232, 248 (S.D.N.Y. 1994)("[c]ertainly it is unremarkable that [defendant] selected as the target of parody a readily recognizable product; indeed, one would hardly make a spoof of an obscure or unknown product!"); *see also Hilfiger,* 221 F.Supp.2d at 416 ("Hilfiger's famous mark likely allows consumers both immediately to recognize the target of the joke and to appreciate the obvious changes to the marks that constitute the joke").

        In the *Tommy Hilfiger* case, cited by Defendants, the Southern District of New York dismissed Plaintiff Hilfiger's claim of infringement on summary judgement, finding the use of the name "Timmy Holedigger" for a brand of pet perfume was a permissible parody of the Hilfiger name and did not infringe Hilfiger's trademark. 221 F.Supp.2d at 420. The Court found that although Hilfiger was in the fragrance business, it did not

manufacture pet perfumes, and the use of the name "Timmy Holedigger" was an obvious parody.  *Id.*

While it is undisputed that Plaintiff possesses a strong and widely recognized mark, this Court is persuaded by the factually similar *Hilfiger* decision.  The name "Chewy Vuiton" is, like "Timmy Holedigger," an obvious parody of a famous brand name.  The fact that the real Vuitton name, marks, and dress are strong and recognizable makes it unlikely that a parody—particularly one involving a pet chew toy and bed--will be confused with the real product.  As the *Hilfiger* Court held, "[a] distinctive mark will not favor plaintiff in these circumstances."  *Id.* at 416.

    B.  Similarity of the Marks

The next factor that is to be considered is the similarity of the marks and trade dress.  Once again, Defendants do not deny that the marks are similar, but argues that the name "Chewy Vuiton" and the associated marks and colorings are a parody of the Vuitton name and marks.  As stated before, similarity is an essential part of a parody, as the similar marks and trade dress must "convey two simultaneous-and contradictory-messages: that it is the original, but also that it is *not* the original and is instead a parody."  *People for the Ethical Treatment of Animals,* 263 F.3d at 366.  In this case, Plaintiff's marks contain an interlocking L and V, with two distinct coloring

patterns, printed on leather women's handbags.[1]  (Pltf.'s Mot. Summ. J. Ex. at A4-A5).  The marks used by Defendants are an interlocking C and V with similar coloring schemes and patterns. There is no doubt that the two are similar.  Nonetheless, this Court has considered the evidence, and finds that two simultaneous messages are conveyed by Defendants' marks and dress.  The marks and dress are similar enough for the average consumer to recognize a humorous association with the Vuitton mark, without likely confusing that same customer that it *really is* a Vuitton product.  The similarities do exist, but they are necessary as part of the parody, for without them, no parody exists.

C.  Proximity of the Products

The Court must next consider the proximity of the products.  The Court will analyze the similarity of the facilities and advertising that the Plaintiff and Defendants use in their businesses, as well as the similarities in the products themselves.  *Pizzeria Uno,* 747 F.2d at 1527.

i. Vuitton Handbags and Chewy Vuiton Toys

---

[1]Plaintiff's trade dress includes one design with a white background and a pastel color pattern consisting of blue, pink, yellow, green, and brown marks(Vuitton Monogram Multicolor), including the interlocking L and V.  An additional trade dress offered by the Plaintiff includes a brown background with red cherries and green stems (Vuitton Cerises).  Both of Plaintiff's trade dresses are printed on leather handbags.  Defendants offer products that look similar, but also different.  Defendants' mark and dress are slightly different in color and contain an interlocking C and V.  But most importantly, they are printed on a plush dog toy or a dog bed.  Defendants do not make high-end leather products or actual purses.

The products directly at issue in this case are the Vuitton handbags and the Chewy Vuiton toys, which parody them. Comparing the two sets of products, this Court finds that Vuitton's high-end, leather luxury handbags share little product-type similarity to a plush dog toy or dog bed that is shaped like a handbag. Defendants' products are not bags, are not made out of leather, and are clearly not meant to be used as handbags, even for children. After carefully considering each product, this Court finds that the two product lines fall into completely different industries, and are thus not proximate in this respect.

### ii.  Proximity of Louis Vuitton Toys and Pet Products to Chewy Vuiton Products

Vuitton sells a limited amount of pet products, such as collars, leashes, leads, and pet carriers, and also sells one toy item, a stuffed bear for children. These facts weigh in favor of the Plaintiff. Nonetheless, there is not enough similarity between the two to likely cause customer confusion. While Vuitton makes high-end pet products such as collars and leashes that range in price from $215 to $1600, the Chewy Vuiton line consists of toys and beds, mostly priced below $20, made for pets to destroy or sleep upon–or on occasion to wrestle over with their peers or find other, more creative ways to desecrate.[2]

---

[2]Plaintiff points out that Chewy Vuiton beds sell for $120, which is somewhat comparable to a $215 collar made by Vuitton. In doing so, Plaintiff seeks to compare the single most expensive item made by HDD to the cheapest pet item made by Vuitton. Despite the fact that beds are larger and more expensive items than collars or leashes, the bed price is still nearly $100

Plaintiff manufactures only one toy item, a stuffed bear for children. (Pltf.'s Reply at Ex. 3). Plaintiff does not manufacture pet toys or any toy versions of its handbags that look similar to Defendants' products. However, Louis Vuitton does manufacture a suede pet carrier, which is somewhat similar to the Chewy Vuiton products. (Pltf.'s Mot. Summ. J. Ex. A85-A86). Accordingly, this factor offers support to Plaintiff's position.

### iii.  Trade and Marketing Channels

Louis Vuitton products and Chewy Vuiton products are primarily sold and marketed in different trade channels. As noted, Louis Vuitton does sell a limited number of products to pet owners, however these products, as all LVM products, are sold exclusively through their own boutique stores or through boutiques in department stores.[3] (Pltf.'s Opp. Ex. D). To the contrary, Chewy Vuiton products are primarily sold in retail pet stores, and are dispersed to those stores through a distributor called Wholesale Pet. (Pltf.'s Mot. Summ. J. Ex. B at 175:19-176:5). The only store identified as carrying both Chewy Vuiton

---

less than Vuitton's cheapest product, while Vuitton's most expensive pet products are priced at $1600. Furthermore, the $120 price does not indicate a "high-end" status for dog beds, many of which range above $100.

[3]Melissa Cohen testified that Vuitton sells "high-end items," and that all of the Vuitton stores were owned by Louis Vuitton. (Pltf.'s Mot. Summ. J. Ex. D). Ms. Cohen further testified that Vuitton operates its own stores in a number of high-end department stores, such as Bloomingdale's, Saks Fifth Avenue, Neiman Marcus, and Macy's in New York City. *Id.* Vuitton does not sell its items through independent third party vendors. *Id.*

and Louis Vuitton products is the Macy's in New York.  *Id.* at 175:6-12.  Likewise, LVM products are marketed primarily through high-end fashion magazines and feature models and celebrities, while Chewy Vuiton products are marketed through pet-supply channels and feature dogs.  (Def.'s Mot. Summ. J. Ex. F; Pltf's Mot. Summ. J. Ex. A).

Both product lines are also sold and marketed through the internet.  (Def.'s Mot. Summ. J. Ex. F; Pltf's Mot. Summ J. Ex. A).  This fact by itself does not imply that the same trade channels were used for the purposes of determining likely customer confusion.  Reaching this same issue, the Sixth Circuit recently concluded that "a non-specific reference to Internet use is no more proof of a company's marketing channels than the fact that it is listed in the Yellow Pages of the telephone directory."  *Therma-Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 633 (6th Cir. 2002).  In that case, the Sixth Circuit outlined several additional factors to consider:

> (1) whether both parties use the Web as a *substantial* marketing and advertising channel, (2) whether the parties' marks are utilized in conjunction with Web-based products, and (3) whether the parties' marketing channels overlap in any other way.

*Id.* (internal quotation marks and citations omitted) (emphasis in original).  In this case, both Vuitton and HDD use the internet as a substantial marketing and advertising channel, and both use their marks in conjunction with their web-based products.

10

Finally, the two products are not sold on the same web sites, as Vuitton products are sold exclusively through Vuitton's web site, eluxury.com, while HDD products are sold through independent vendors.  Nonetheless, because both are sold in malls and through the internet, there is some overlap between the retail markets and trade channels, and this factor weighs in favor of the Plaintiff.

### D.  Likelihood that Prior Owner will Bridge the Gap Between the Products

Currently, nothing alleged indicates Louis Vuitton's desire to enter the dog toy market.  Therefore, this factor weighs in favors of the Defendants.

### E.  Actual Confusion

"Actual confusion" means actual consumer confusion that allows the seller to pass off his goods as the goods of another. *The Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 963 (2d Cir. 1996).  Plaintiff is not required to prove actual confusion to prove the likelihood of confusion. *Pizzeria Uno,* 747 F.2d at 1527.  However, evidence of actual confusion is the best evidence of likelihood of confusion.  *Synergistic Int'l, LLC v. Korman,* 402 F.Supp.2d 651, 663 (E.D. Va. 2005).

In this case, Plaintiff has provided no substantial evidence of "actual confusion," and conceded during oral argument that no actual confusion exists.  In fact, Plaintiff only referred to a single instance where Defendants' customer, Jake's

Dog House ("Jake's") referred to HDD's products as "Louis Vuittons."  (Jake's Dep. Tr. at 45).  However, taken in context with the remainder of the deposition, it is clear that no actual confusion existed.  Deponent explained, rather bluntly, "if I really thought that a $10 dog toy made out of fluff and stuff was an actual Louis Vuitton product, [then] I would be stupid." *Id.* It is clear from the deposition testimony offered by the Plaintiff, taken in its whole context, that no actual confusion existed on the part of Jake's that Chewy Vuiton products were *actually* Louis Vuitton.

Nor are the alleged misspellings of "Chewy Vuiton" as "Chewy Vuitton" indicative of customer confusion.[4]  First, the use of the word "Chewy" is not easily mistaken for the French first name "Louis," and clearly indicates parody.  Second, spelling the second word "Vuiton" or "Vuitton" does not indicate any confusion, other than how to spell the word itself.  The fact that a customer mistakenly spells the parody product with two "t"s instead of one does not convey that the customer was confused about the source of the product.

For the foregoing reasons, the Court finds no credible evidence of actual confusion.  Nothing in the facts presented indicates that customers purchasing or viewing "Chewy Vuiton"

---

[4]The Second Circuit reached a similar conclusion in *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 504 (2d Cir. 1996).

products believed those products were made by or associated with Plaintiff Louis Vuitton other than as a parody of the Vuitton name.  Considering all of these facts, this Court finds that the lack of actual confusion in this case weighs heavily in favor of Defendants.

F.  Bad Faith on Part of Defendants

Plaintiff argues that Defendants' use of marks and trade dress similar to those of Plaintiff Vuitton were done for the purpose of commercial gain, and not parody, and therefore done in bad faith.  This argument lacks merit.  "An intent to parody is not an intent to confuse the public." *Jordache Enters., Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1486 (10th Cir. 1987).  Instead, "[t]he benefit to one making a parody...arises from the humorous association, not from public confusion as [to] the source of the marks." *Id.*  "Chewy Vuiton" is a parody of "Louis Vuitton."  The benefits that HDD derives from the use of this parody arise not from customer confusion, but from the humorous association between "Chewy Vuiton," a dog toy, and the high-end line of products made by Louis Vuitton.  There is no showing of bad faith on the part of the Defendants, and this factor weighs heavily in favor of Defendants.

G.  Additional Factors Identified by the Second Circuit:
    Quality of Defendants' Product and Sophistication of Buyers

The Second Circuit has identified two further areas of consideration to determine if customer confusion exists: (1)

13

quality of Defendants' products and (2) sophistication of buyers. *Polaroid Corp. v. Polaroid Electronics Corp.,* 287 F.2d 492, 495 (2d Cir. 1961). With respect to the quality factor, the Second Circuit has held that similarity in quality enhances the likelihood of confusion. *Morningside Group, Ltd. v. Morningside Capital Group, LLC,* 182 F.3d 133, 142 (2d Cir. 1999). With respect to the sophistication factor, the Second Circuit has held that a substantial price associated with high-end goods "requires buyers to exercise care before they part with their money, and such sophistication generally militates against a finding of confusion." *Charles of the Ritz, Ltd. v. Quality Distribs, Inc.,* 832 F.2d 1313, 1323 (2d Cir. 1987).

In this case, there is a clear difference in quality between Vuitton products and the "Chewy Vuiton" line made by HDD and sophistication of the buyers. Louis Vuitton mainly manufactures high-quality leather handbags associated with wealth and social status. While Vuitton makes some pet products such as collars and leashing, ranging in price from $215 to $1600, the items are high-end and mainly made of fine leather. To the contrary, the "Chewy Vuiton" line consists of plush chew toys and beds, mostly priced below $20, made for pets to destroy or sleep upon. Plaintiff points out that Chewy Vuiton beds sell for $120, which is somewhat comparable to a $215 collar made by Vuitton. However, this argument is unconvincing. The dog bed mentioned is

14

the single most expensive item made by HDD, and many dog beds
range from $50 to $100 in price.  On the other hand Vuitton's
limited number of pet products begin at $215, the most expensive
being priced at $1600.  Contrary to dog beds, these prices are
clearly high-end for collars, leashes, and pet carriers.

H.  Conclusion for Trademark Infringement

For the foregoing reasons, this Court finds, taking the
evidence in the light most favorable to the Plaintiff, no
reasonable trier of fact would conclude that likelihood of
confusion exists between Plaintiff's and Defendants' products.
This Court has considered all of the *Pizzeria Uno* factors and
finds that, while the Plaintiff's mark is strong and there is
some proximity of the products, the lack of actual confusion and
bad faith, coupled with the considerations of parody
substantially outweigh the factors that favor the Plaintiff.
While consideration of the *Pizzeria Uno* factors were sufficient
in making its determination, the Court is further swayed by the
additional factors set out by the Second Circuit, which also
favor the Defendants.  For these reasons, the Court concludes
that summary judgment is appropriate on the issue of trademark
infringement.  The Court will therefore deny Plaintiff's motion
for summary judgment and grant Defendants' cross-motion on the
count of trademark infringement.

**Count II: Dilution**

15

Plaintiff seeks an injunction under the Federal Trademark Dilution Act (FTDA), 15 U.S.C. § 1125(c). The Trademark Dilution Act provides that the owner of a famous mark can enjoin "another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." *CareFirst of Maryland*, *Inc. v. First Care*, 434 F.3d 263, 274 (4th Cir. 2006)(citing 15 U.S.C. § 1127). The Fourth Circuit has defined dilution as "the lessening of the capacity of a famous mark to identify and distinguish goods or services." *Id.*

While a court may find dilution even where it does not find likelihood of confusion, *Id.,* the Supreme Court has held that the dilution statute "unambiguously requires a showing of actual dilution, rather than a likelihood of dilution." *Moseley v. Secret Catalogue, Inc.,* 537 U.S. 418, 433 (2003). Actual dilution occurs by either a blurring of the mark's identification or a tarnishment of the positive associations the mark has come to convey. *See id.* This action commenced on March 24, 2006. However, following the commencement of litigation, the dilution statute was amended by Congress to exclude the "actual dilution" requirement in place of a "likely dilution" one. *See* Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat. 1730 (amending 15 U.S.C. § 1125(c)(1946)). This Court must therefore decide the retroactive effect of the amended statute.

16

In *Landgraf v. USI Film Products, Inc.*, 511 U.S. 244 (1994), the Supreme Court established a two-part test to determine the retroactive effect of a statute.  First, a court should determine "whether Congress has expressly prescribed the statute's proper reach."  *Id.* at 280.  In an instance where Congress has proscribed an effective date, courts must respect the will of Congress.  *Id.*  Second, when Congress has not proscribed an effective date, a court must determine if the statute will "impair rights a party possessed when [it] acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  *Id.*  If it does, then a court should not apply the new statute to the pending case.  *Id.; see also Altizer v. Deeds,* 191 F.3d 540, 545 (4th Cir. 1999)(quoting *Landgraf,* 511 U.S. at 280).  However, the Supreme Court also stated that "relief by injunction operates *in futuro* and the right to it must be determined as of the time of the hearing*."  American Steel Foundries v. Tri-City Central Trades,* 257 U.S. 184, 201 (1921); *see also Landgraf,* 511 U.S. at 273-74.  In this case, Plaintiff has pled for injunctive relief on the issue of dilution.  *See* Compl. at ¶78.  Therefore, the amended statute will apply in this case.

A.  Dilution by Blurring

Dilution by blurring is association arising from the similarity between a mark or trade name and a famous mark that

impairs the distinctiveness of the famous mark. *See* Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat. 1730.  Dilution by blurring occurs when consumers mistakenly associate a famous mark with goods and services of a junior mark, thereby diluting the power of the senior mark to identify and distinguish associated goods and services. *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.,* 955 F.Supp. 605, 616 (E.D. Va. 1997)(citing *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1031 (2d Cir. 1989).  According to the amended statute, in determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:

> (i) the degree of similarity between the mark or trade name and the famous mark;
> (ii) the degree of inherent or acquired distinctiveness of the famous mark;
> (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark;
> (iv) the degree of recognition of the famous mark;
> (v) whether the user of the mark or trade name intended to create an association with the famous mark; and
> (vi) any actual association between the mark or trade name and the famous mark.

Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat. 1730.  Since the Fourth Circuit has not offered opinion on the new "likelihood of dilution" standard, for guidance this Court looks to the Second Circuit's application of New York General Business Law § 360-l, which incorporates the likelihood

18

of dilution standard now adopted by Congress.  Using this standard, the Second Circuit and its district courts have held on numerous occasions that in the case of parody, "the use of famous marks in parodies causes no loss of distinctiveness, since the success of the use depends upon the continued association with the plaintiff."  *See Yankee Publishing, Inc. v. News America Publishing, Inc.,* 809 F.Supp. 267, 282 (S.D.N.Y. 1992)(applying New York statute); *see also Tommy Hilfiger,* 221 F.Supp.2d at 422-23 ("the presence of a famous mark on certain products may have little diluting effect, particularly where it is obvious that the defendant intends the public to associate the use with the true owner"); *Hormel,* 73 F.3d at 506 (finding no likelihood that defendant's puppet "Spa'am" would dilute the association of the Hormel mark with "Spam" lunchmeat).

Defendants do not dispute that the Plaintiff's mark is strong and famous.  Nonetheless, this Court finds no likelihood that the parody of Plaintiff's mark by Defendants will result in dilution of Plaintiff's mark.[5]  This Court finds, like the New York and Second Circuit courts, the mark continues to be associated with the true owner, Louis Vuitton.  Its strength is not likely to be blurred by a parody dog toy product.  Instead of blurring Plaintiff's mark, the success of the parodic use depends

---

[5]This Court also agrees with Defendants' argument that actual dilution does not exist, but in light of the amended statute concentrates instead on likelihood of dilution.

19

upon the continued association with Louis Vuitton.  This Court finds that no reasonable trier of fact could conclude that Plaintiff's mark is diluted by blurring in this case, and summary judgment is appropriate.  Accordingly, Defendants' motion for summary judgment will be granted for dilution by blurring.

   B.   Dilution by Tarnishment

        Tarnishment occurs when the plaintiff's trademark is likened to products of low quality, or is portrayed in a negative context.  *Deere & Co. v. MTD Prods.,* 41 F.3d 39, 43 (2d Cir. 1994).  When the association is made through harmless or clean puns and parodies, however, tarnishment is unlikely.  *Jordache Enters. v. Hogg Wyld, Ltd.,* 625 F.Supp. 48, 57 (D.N.M. 1985), *aff'd,* 828 F.2d 1482 (10th Cir. 1987).  Plaintiff's assertions that Chewy Vuiton products tarnish LVM's marks by associating "inferior products" with the Vuitton name are baseless, and without merit.  Plaintiff provides neither examples of actual tarnishment, nor any evidence that shows likely tarnishment.  At oral argument, Plaintiff provided only a flimsy theory that a pet may some day choke on a Chewy Vuiton squeak toy and incite the wrath of a confused consumer against Louis Vuitton.  Therefore, even taking into account the amended statute, this Court concludes that no reasonable trier of fact could find for the Plaintiff on the issue of dilution by tarnishment.  Accordingly,

this Court will grant summary judgment in favor of the Defendants on this issue.

### Count III: Counterfeiting

The Lanham Act defines a counterfeit mark as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1527. Determination of whether certain imported articles bear a counterfeit mark is to be determined from the perspective of the average purchaser rather than from the perspective of an expert. *See Montres Rolex, S.A. v. Snyder,* 718 F.2d 524 (2d Cir. 1983). In this case, the marks are not identical or indistinguishable. While they are close enough for the average consumer to appreciate the parody, an interlocking "CV" is clearly distinguishable from an interlocking "LV", and the average purchaser would not confuse the mark of Chewy Vuiton products with those of Plaintiff.  Nor are the coloring patterns and designs identical or indistinguishable.  After considering both marks, this Court finds that no reasonable trier of fact could conclude otherwise.  Therefore, this Court will grant Defendants' motion for summary judgment and deny Plaintiff's motion on this count.

### Count IV: Copyright Violation

To prevail on a claim for copyright infringement, Plaintiff must show that (1) it owned a valid copyright; and (2)

Defendants copied original elements of its copyrighted work. *Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655, 660 (4th Cir. 1993)(citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991)).

A.  Ownership of the Copyright and Public Domain

Defendants first argue for summary judgment on the ground that Plaintiff does not own the Vuitton copyright design at issue, because it was not qualified as a "work for hire."[6]  As support for this argument, Defendants point to the web site www.eluxury.com, in which the copyright was noticed with the name of its designer, Murakami.  However, Plaintiff has demonstrated that the copyright was assigned to LVM in 2002, and is the valid, rightful owner of the copyrighted design.  Plaintiff has provided a copy of the assignment agreement to the Court, which shows LVM as the owner of the copyright by assignment.  (Pltf's Opp. Summ. J. Ex. D at ¶1).  However, only a redacted version was provided to the Court, and material proof of ownership was not included. *Id.*  Plaintiff also demonstrated, through affidavit facts, that the label on eLuxury's web site was a mistake that has since been corrected.  Defendants also argue that the Vuitton marks were part of the public domain.  The Court recognizes that a dispute

---

[6]Defendants cite several Supreme Court and Circuit Court cases which define "work for hire," and illustrate how copyright ownership can be retained under this doctrine.  However, since Plaintiff claims ownership by assignment, the Court will not reach the merits of the "work for hire" argument.

of fact exists over ownership of the copyright, nonetheless, Defendants' successful invocation of the fair use defense makes resolution of this issue unnecessary for purposes of summary judgment.  Because, as explained below, Defendants' use as a parody constitutes a fair use, Defendants are entitled to summary judgment on this issue regardless of any dispute as to the copyright's true ownership.

    B.  Defendants' Fair Use Defense

        Defendants next argue that, even if a valid and enforceable copyright is owned by LVM, Defendants' use of the LVM design is a non-infringing, fair use of the copyrighted material for the purpose of parodying the LVM design.  The Supreme Court has developed a test to determine fair use, by which courts are to consider by a totality of the circumstances:

> (1) purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational uses; (2) nature of the copyrighted work; (3) amount and substantiality of the portion used in relation to the copyrighted work as a whole; (4) the effect of the use upon potential market for or value of the copyrighted work.

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 577 (1994). Fair use is an affirmative defense with the burden of proof on the defendant.  *Id.* at 590.

        This Court must first consider the purpose and character of the use.  Commercial use is one factor to be

23

considered in determining fairness, and is not by itself
presumptively unfair. *Id.* at 591.  Parody, even when done for
the purpose of commercial gain, can be a fair use, as the Supreme
Court has stated specifically that it is more likely that "the
new work [a parody] will not affect the market for the original
in a way cognizable under this factor, that is, by acting as a
substitute for it." *Id.* at 591.  In this case, the use of
similar marks and name in a line of dog chew toys and beds
parodies the high-end fashion status of LVM's products in a
market that LVM does not participate–the market for pet toys and
beds.  This Court finds that the use of similar markings and
colors to those copyrighted by LVM for Chewy Vuiton products is a
parody.

The next element, nature of the copyrighted work
(creative) is a less-important factor for a parody case and "not
much help" in separating infringers from parodies.  *Id.* at 586.
Therefore, this Court will not address nature of the copyrighted
work, other than to acknowledge that it is a creative design.

This Court will finally consider the amount and
substantiality of the portion used in relation to the copyrighted
work as a whole.  The Supreme Court held that in a parody case,
the parody itself

> necessarily springs from recognizable allusion
> to its object through distorted imitation.
> Its art lies in the tension between a known

> original and its parodic twin.  When parody
> takes aim at a particular original work, the
> parody must be able to 'conjure up' at least
> enough of that original to make the object of
> its critical wit recognizable.

*Id.* at 588.

In this case, the name "Chewy Vuiton" is an obvious wordplay on the name Louis Vuitton, and the superimposed C and V on the logo are intended to "conjure up" enough of the Louis Vuitton logo in order to make the object of its wit--a humorous play on Louis Vuitton's high-end image in the form of dog toys-- recognizable.  The parody is not possible unless the logo and name are similar to those of Plaintiff, and therefore such parody constitutes a fair use in this respect.

Finally, this Court considers interference with the potential market for plaintiff's original and derivative works caused by Defendants' actions.  First, the market overlap between Plaintiff and Defendants is tenuous.  Louis Vuitton's primary market is for high-end women's apparel, not pet toys.  As explained *supra,* Plaintiff does sell some pet items, but not toys or beds, and only in a limited, high-end market.  Second, Plaintiff has offered no evidence of interference with potential markets or control of its copyrights.  Defendants, on the other hand, have presented deposition testimony and an expert declaration indicating that there has been no effect on LVM's potential markets or control of its copyrights.  (Def.'s Mot.

Summ. J. Ex. E-F).  For the foregoing reasons, summary judgment should be granted for the Defendants.

### IV.  Conclusion

For the foregoing reasons, will deny Plaintiff's motion for summary judgment and grant Defendants' motion for summary judgment.  An appropriate Order will issue.

November 3, 2006                _____/s/_____
Alexandria, Virginia                    James C. Cacheris
                              UNITED STATES DISTRICT COURT JUDGE